# UNITED STATES DISTRICT COURT

# MIDDLE DISTRICT OF LOUISIANA

**ROBAE AUSTIN**                                                      **CIVIL ACTION**

**VERSUS**

**N. BURL CAIN, ET AL.**                                              **NO. 14-276-JJB-RLB**

## NOTICE

Please take notice that the attached Magistrate Judge's Report has been filed with the Clerk of the United States District Court.

In accordance with 28 U.S.C. § 636(b)(1), you have fourteen (14) days after being served with the attached Report to file written objections to the proposed findings of fact, conclusions of law and recommendations therein. Failure to file written objections to the proposed findings, conclusions, and recommendations within 14 days after being served will bar you, except upon grounds of plain error, from attacking on appeal the unobjected-to proposed factual findings and legal conclusions of the Magistrate Judge which have been accepted by the District Court.

ABSOLUTELY NO EXTENSION OF TIME SHALL BE GRANTED TO FILE WRITTEN OBJECTIONS TO THE MAGISTRATE JUDGE'S REPORT.

Signed in Baton Rouge, Louisiana, on June 28, 2017.

_____
**RICHARD L. BOURGEOIS, JR.**
**UNITED STATES MAGISTRATE JUDGE**

UNITED STATES DISTRICT COURT

MIDDLE DISTRICT OF LOUISIANA

ROBAE AUSTIN                                                                                    CIVIL ACTION

VERSUS

N. BURL CAIN, ET AL.                                                                        NO. 14-276-JJB-RLB

<u>**MAGISTRATE JUDGE'S REPORT AND RECOMMENDATION**</u>

This matter is before the Court on the petitioner's application for a writ of habeas corpus pursuant to 28 U.S.C. § 2254.  The petitioner, Robae Austin, challenges his conviction, entered in 2011 in the Twenty-first Judicial District Court for the Parish of Livingston, State of Louisiana, on one count of second degree murder.  The petitioner contends that (1) he was denied his right to a fair and impartial jury under the 6th and 14th Amendments; (2) he was denied his right to a fair and impartial jury under *Batson v. Kentucky*; and (3) the evidence was insufficient to support his conviction.

**Factual Background**

The facts, as accurately summarized in the decision of the Louisiana First Circuit Court of Appeal (*State v. Austin*, 11-2150 (La. App. 1 Cir. 6/8/12), 2012 WL 2061531), are as follows: On July 23, 2009 at about 11:00 p.m., Gregory Brumfield, while standing on Drake Road in Livingston Parish, was shot and killed.  Eyewitnesses testified that they saw a small red truck drive away from Brumfield immediately after he was shot.  Cedric McClain testified at trial that he lived on Drake Road.  He was outside between 10:00 p.m. and 11:00 p.m. washing his car on the night Brumfield was shot.  According to McClain, a red truck with two black people in it passed by his house.  The truck had a white stripe at the bottom and one of the hubcaps was different.  The driver in the truck was wearing a red bandana on his face like a ski mask. The

bandana also had black and white colors in it. When the truck got to the end of the street, McClain heard gunshots.

Jockel Hilliard testified at trial that he lived on Ed Brown Road, which meets Drake Road. On the night of the shooting around 11:00 p.m., Hilliard was outside. Hilliard saw Brumfield, greeted him, and then sat down in his (Hilliard's) yard. Hilliard heard gunshots. He ran toward Brumfield and saw a little red truck at a stop sign at the end of Drake Road. The truck turned left. Hilliard went to Brumfield, who was lying on the ground, shot, but still alive. Brumfield told Hilliard, "I can't believe he shot me." Hilliard went back to his house to tell his mother, who called 911.

John Lamonte testified at trial that he and his girlfriend, Jennifer Stewart (now his wife), went to Tillman Park on the afternoon of the shooting to purchase crack cocaine from the petitioner. Lamonte and Stewart had bought crack from the petitioner in the past. The petitioner was always in the same location when he sold the crack to them—in front of an abandoned house. The house had the numeral 700 on the side of it, spray-painted in very large digits. Later that same evening, sometime between 9:00 p.m. and 10:30 p.m., Lamonte and Stewart went back to the petitioner to buy more crack. They did not have any money, so they asked the petitioner to "front" them the crack. The petitioner told them no, but said he would get crack for them if Lamonte let him use his truck. Lamonte had a small red 1994 Mazda truck with a white stripe along the bottom. Lamonte agreed to let the petitioner use his truck. Lamonte saw that the petitioner had a gun and told him he could not get in his truck with the gun. The petitioner handed the gun to someone. Lamonte and the petitioner then drove to Lamonte's house (his parents' house), which was a few minutes away from Tillman Park. Lamonte got out of his truck and the petitioner left in the vehicle.

According to Lamonte, the petitioner kept his truck for about an hour. The petitioner gave Lamonte his cell phone number before he left. Lamonte called the petitioner a couple of times inquiring of his whereabouts. The petitioner brought the truck back to Lamonte, but did not have any crack cocaine for them. There was a black man in the passenger seat whom Lamonte did not recognize. Lamonte brought the petitioner and the unknown person back to Tillman Park Road and returned home.

Lamonte picked up Stewart and they headed to Stewart's cousin's house in Lamonte's truck. On the way, they were stopped by Detective Jimmy Speyer, with the Livingston Parish Sheriff's Office. Detective Speyer had been informed earlier that there had been a drive-by shooting involving a small red truck. Lamonte and Stewart are both Caucasian, while the suspects the police were looking for were black males. The detective therefore let Lamonte and Stewart go and continued patrolling. The following day, Lamonte and Stewart were asked by the police to come to the police station in Albany to give statements, which they did. After they explained how the petitioner came to be in possession of Lamonte's truck and that he was driving it during the time Brumfield was shot and killed, the police had Stewart show them the place where the petitioner sold drugs. When they arrived at the same abandoned house that Lamonte and Stewart were at the day before, the police observed the petitioner standing near the house with a red bandana in his pocket. The petitioner was arrested. The petitioner briefly spoke to Detective Ben Bourgeois, the Livingston Parish Sheriff's Office's lead detective on the case. The petitioner denied any involvement in the shooting and denied ever having been in Lamonte's truck.

The petitioner did not testify at trial. Lamonte's truck was examined for DNA and fingerprints. The petitioner's DNA and fingerprints were not found in the truck. No gun was recovered.

**Procedural History**

After a trial by jury conducted in April, 2011, the petitioner was found guilty of second degree murder. The trial court denied the petitioner's Motion for New Trial and on May 19, 2011, the petitioner was sentenced to life imprisonment without benefit of parole, probation or suspension of sentence. The petitioner thereafter appealed his conviction, through counsel and by way of a *pro se* brief. Three issues were presented therein: (1) sufficiency of the evidence; (2) the trial court's denial of the petitioner's Motion for New Trial based on juror misconduct; and (3) denial of the petitioner's *Batson* challenges at trial. On June 8, 2012, the petitioner's conviction and sentence were affirmed by the Louisiana Court of Appeal for the First Circuit. *See State v. Austin*, 11-2150 (La. App. 1 Cir. 6/8/12), 2012 WL 2061531. The petitioner's application for supervisory review in the Louisiana Supreme Court was denied on February 8, 2013. *See State v. Austin*, 12-1595 (La. 2/8/13), 108 So.3d 77.

On or about May 6, 2014, the petitioner filed the instant application for habeas corpus relief in this Court.

**Standard of Review**

The standard of review in this Court is that set forth in 28 U.S.C. § 2254(d). Pursuant to that statute, an application for a writ of habeas corpus shall not be granted with respect to any claim that a state court has adjudicated on the merits unless the adjudication has "(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or (2) resulted in a

decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." Relief is authorized if a state court has arrived at a conclusion contrary to that reached by the Supreme Court on a question of law or if the state court has decided a case differently than the Supreme Court on a set of materially indistinguishable facts. *Williams v. Taylor*, 529 U.S. 362, 413 (2000).

Relief is also available if the state court has identified the correct legal principle but has unreasonably applied that principle to the facts of the petitioner's case or has reached a decision based on an unreasonable factual determination. *See Montoya v. Johnson*, 226 F.3d 399, 404 (5th Cir. 2000). Mere error by the state court or mere disagreement on the part of this Court with the state court determination is not enough; the standard is one of objective reasonableness. *Id.* *See also Williams v. Taylor*, *supra*, 529 U.S. at 409 ("[A] federal habeas court making the 'unreasonable application' inquiry should ask whether the state court's application of clearly established federal law was objectively unreasonable"). State court determinations of underlying factual issues are presumed to be correct, and the petitioner has the burden to rebut that presumption with clear and convincing evidence. 28 U.S.C. § 2254(e)(1).

## Substantive Review

### *Claim (1): Juror Misconduct*

In Claim (1), the petitioner asserts that he was denied his right to a fair and impartial jury. After the trial, the petitioner moved for a new trial on the grounds that the foreperson of the jury, Nona Karpinski, had failed to disclose that she had a close relationship with two murder victims, and that the jury had discussed the petitioner's teardrop tattoos and concluded that the teardrops represented two murders committed by the petitioner.[1] The petitioner asserts that the trial court

---

[1] The State asserts that the plaintiff's claim regarding the teardrop tattoos is procedurally defaulted. However, a review of the record reveals that the plaintiff presented his claim to the trial court by way of a motion for new trial,

erred in denying his motion without allowing juror Karpinski and another juror, Ms. Grant, to testify concerning what was discussed in the jury room and as to Ms. Karpinski's personal biases.

The petitioner takes issue with the state courts' interpretation of Louisiana Code of Evidence article 606(B), which precludes testimony regarding the juror's deliberations except as to outside influence and extraneous prejudicial information. However, claims that a state court improperly applied state law do not constitute an independent basis for federal habeas relief. *Estelle v. McGuire,* 502 U.S. 62, 67 (1991). A federal court does "not sit as [a] 'super' state supreme court in a habeas corpus proceeding to review errors under state law." *Wilkerson v. Whitley,* 16 F.3d 64, 67 (5th Cir.1994) (quotation omitted).

The question before this Court is whether the state courts' rulings are contrary to clearly established Federal law. As explained by the Court in *Tanner v. U.S.,* 483 U.S. 107 (1987), "By the beginning of this century, if not earlier, the near universal and firmly established common-law rule in the United States prohibited the admission of juror testimony to impeach a verdict…Exceptions to the common-law rule were recognized only in situations in which an 'extraneous influence' was allege to have affected the jury." The Court further noted that Federal Rule of Evidence 606(b), which is substantially similar to Louisiana Code of Evidence article 606(b), is grounded in the common-law rule against admission of jury testimony to impeach a verdict and the exception for juror testimony relating to extraneous influences, and that Congress specifically understood, considered, and rejected a version of the rule that would

---

which was denied by the trial court without comment. Furthermore, although the appellate court noted that it had nothing to review regarding the teardrop tattoos, the appellate court addressed the claim and stated, "None of the complaints set forth by the defendant allege juror misconduct in the nature of constitutional violations…Communications among jurors…do not amount to "outside influences" or "extraneous prejudicial information"…Because any intra-jury communications that may have taken place were not improper outside influences or extraneous prejudicial information, we find that the trial court properly denied the defendant's motion for new trial…" Accordingly, the petitioner's claim will be addressed on the merits.

have allowed jurors to testify on juror conduct during deliberations. In *Tanner*, the Court concluded that the district court did not err in refusing to hold an evidentiary hearing at which jurors would testify on juror alcohol and drug use during the trial since drugs or alcohol ingested by a juror are not outside influences. In the instant matter, the petitioner has not alleged that jurors Karpinksi and Grant would have testified as to any outside influences extraneous prejudicial information bearing on the petitioner's Sixth Amendment right to an impartial jury.

As to the petitioner's claim that he was deprived of a fair trial due to bias on the part of juror Karpinski, the Sixth Amendment guarantees an impartial jury, and the presence of a biased juror may require a new trial as a remedy. U.S. Const. amend. VI; *see Solis v. Cockrell,* 342 F.3d 392, 400 & n. 44 (5th Cir. 2003). A juror is biased if his "views would prevent or substantially impair the performance of his duties as a juror in accordance with his instructions and his oath." *Soria v. Johnson,* 207 F.3d 232, 242 (5th Cir. 2000) (quoting *Wainwright v. Witt,* 469 U.S. 412, 424 (1985)).

The petitioner alleges that juror Karpinski was actually biased. Actual bias exists when the juror failed to answer a material question honestly on *voir dire*, and a correct response would have provided a valid basis for a challenge for cause. *United States v. Bishop,* 264 F.3d 535, 554 (5th Cir. 2001) (citing and applying *McDonough Power Equip., Inc. v. Greenwood,* 464 U.S. 548, 556 (1984)).

However, inaccurate responses are excused when a query does not elicit the specific information relevant to the juror's disqualification. *See Baca v. Sullivan,* 821 F.2d 1480, 1482-83 (10th Cir. 1987) (no new trial required when juror failed to disclose that his brother was a retired police officer because *voir dire* questions inquired only of close relatives *presently* in law enforcement); *United States v. O'Neill,* 767 F.2d 780, 784-85 (11th Cir. 1985) (no new trial

required when juror failed to disclose that two close friends were narcotics agents because *voir dire* questions inquired only of *relatives* in law enforcement); and *De la Rosa v. Texas,* 743 F.2d 299, 306-06 (5th Cir. 1984) (no new trial required when juror failed to disclose that his stepfather was a repeat murderer because *voir dire* questions did not directly solicit the information).

The petitioner alleges that juror Karpinski failed to disclose that she had a close relationship with two people who had been murdered. The appellate court correctly noted that the trial court asked, "Have any of you, or a close friend, or a relative been the victim in a criminal case? Have you been the victim of a crime?" The appellate court also correctly noted that this inquiry did not directly solicit the information at issue. As explained by the appellate court, the trial court asked if a close friend had been a victim in a criminal case, which suggests that the perpetrator was identified and criminal proceedings were commenced. The appellate court further correctly pointed out that the trial court did not ask if a close friend had been the victim of a crime, rather the trial court asked if the prospective jurors themselves had been the victim of a crime. As such, juror Karpinski's failure to disclose the complained of information is excused since the *voir dire* questions did not directly solicit said information.

Accordingly, the denial of the petitioner's motion for new trial was not contrary to clearly established Federal law. The petitioner's claim should be denied.

### *Claim (2): Batson Challenges*

In Claim (2), the petitioner asserts that potential jurors Van Johnson and Gloria Peters were dismissed by the prosecution because they were African-American. He further maintains that the "race neutral" reasons provided by the State for excusing these potential jurors were inadequate.

The United States Supreme Court held in *Batson v. Kentucky,* 476 U.S. 79 (1986), that an equal protection violation occurs when a party uses a peremptory challenge to exclude a prospective juror on the basis of race. If the challenger makes a prima facie showing of discrimination in the exercise of the peremptory strikes, the burden shifts to the opposing party to offer racially neutral explanations for the challenged juror. This second part of the process does not require the State to give an explanation that is plausible, or even persuasive, so long as it is not inherently discriminatory. *Purkett v. Elem,* 514 U.S. 765, 768 (1995). If a race-neutral reason is given, the trial court must then decide whether the challenger has proven purposeful discrimination. This third and final step in the *Batson* analysis involves an examination of the credibility of the State's race-neutral reasons, but the ultimate burden of persuasion as to racial motivation in exercising a peremptory challenge rests with, and never shifts from, the petitioner. *Purkett, supra.* Whether there has been intentional racial discrimination is a question of fact, *Moody v. Quarterman,* 476 F.3d 260, 266 (5th Cir. 2007), and the trial court's evaluation of discriminatory intent is to be accorded great deference on review, and should not be reversed unless it is clearly erroneous. *Id.*

The petitioner directs this Court's attention to the decision of the United States Supreme Court in *Miller-El v. Dretke,* 545 U.S. 231 (2005), wherein habeas relief was granted to a petitioner in a case involving allegations of purposeful discrimination under *Batson.* In *Miller-El,* the Supreme Court observed that, "[i]f a prosecutor's proffered reason for striking a black panelist applies just as well to an otherwise-similar nonblack who is permitted to serve, that is evidence tending to prove purposeful discrimination to be considered at *Batson's* third step." The *Miller-El* case, however, has not been determined to alter the standard of review set forth in

*Batson. See Rice v. Collins,* 546 U.S. 333 (2006), wherein the United States Supreme Court restated and employed the three-step Batson analysis. *See also Moody v. Quarterman, supra.*

A review of the record in this case reflects that, after the exercise of peremptory challenges as to potential jurors Gloria Peters and Van Johnson, the petitioner's counsel interposed an objection based upon *Batson*. The trial judge noted the objections for the record, but did not further explore the *Batson* challenges until after the jury was seated.

After the provision of asserted race-neutral rationales by the State for the exclusion of the prospective jurors, the trial court judge ruled, over the objection of defense counsel, that the articulated race-neutral reasons were sufficient to justify the peremptory challenges.[2] This Court does not find the trial court's ruling to be an unreasonable determination of the facts in light of the evidence presented or otherwise erroneous. As has been often noted, the trial judge is in the best position to determine whether a race-neutral explanation is offered in good faith, or is a subterfuge for racial bias. In the instant case, there is nothing in the record that rebuts the determination of the trial court that the State's expressed reasons for exclusion were non-pretextual and were legitimate grounds for exercise of the challenges against the prospective jurors at issue. Although the petitioner would seek to rely upon *Miller-El* to contend that the rationale given by the State was pretextual, he has pointed to no side-by-side comparison, as was offered in *Miller-El* between challenged jurors and accepted jurors, which would tend to show discriminatory intent.[3] Accordingly, the trial court and appellate court did not err in concluding that the petitioner failed to meet his burden of showing discriminatory intent.

---

[2] As to potential juror Peters, the State based its peremptory challenge on Ms. Peters' prior experience as a juror which was apparently stressful, and her admission that she was not sure that she could be fair or impartial. As to potential juror Johnson, the State based its peremptory challenge on the fact that Mr. Johnson became visibly upset when asked about his son who was serving time in jail.

[3] The petitioner argues that State's proffered reason for striking potential juror Johnson applied equally to juror Phyllis Saucier, who was permitted to serve as an alternate. However, a review of the record reveals that Mr. Johnson's son was serving time in jail, and Mr. Johnson became visibly upset while discussing the same, whereas

*Claim (3): Sufficiency of the Evidence*

In Claim (3), the petitioner asserts that the evidence presented was insufficient to establish the petitioner's identity as the perpetrator. The standard for gauging the sufficiency of the evidence to support a conviction is well established. "[T]he relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia,* 443 U.S. 307, 319 (1979) (emphasis in original). Even if state law would impose a more demanding standard of proof, only the *Jackson* standard must be satisfied to maintain the constitutionality of a conviction. *Gilley v. Collins,* 968 F.2d 465, 468 (5th Cir. 1992); *Schrader v. Whitley,* 904 F.2d 282, 284 (5th Cir. 1990). The evidence may be found sufficient to support a conviction even though the facts also support one or more reasonable hypotheses consistent with the petitioner's claim of innocence. *Gilley, supra; Gibson v. Collins,* 497 F.2d 780, 783 (5th Cir. 1991).

The substantive elements which the state must prove in order to convict a petitioner are determined by state law. At the time of the petitioner's offense, second degree murder included "the killing of a human being when the offender has the specific intent to kill or inflict great bodily harm." La. R.S. 14:30.1A(1).

The appellate court invoked and applied the *Jackson* standard, and looked at the evidence to determine if the State established the petitioner's identity as the perpetrator. The appellate court summarized the evidence as follows: Testimony and physical evidence introduced at the trial established that Brumfield was shot several times around 11:00 p.m. while standing on Drake Road. Brumfield died from gunshot wounds to his chest and abdomen. Lamonte testified

---

Ms. Saucier's sister-in-law's husband was serving time in jail and there is nothing in the record indicating an emotional response on Ms. Saucier's part when questioned regarding the same.

that on the night Brumfield was killed, he and his girlfriend (now wife), Stewart, drove to Tillman Park to purchase crack cocaine from the petitioner sometime between 9:00 p.m. and 10:30 p.m. Lamonte and Stewart had both purchased cocaine from the petitioner in the past in the same location. Lamonte was driving a red 1994 Mazda truck with a white, or off-white, stripe running the length of the bottom of the doors and truck bed. The right front hubcap was missing. The petitioner had on a white T-shirt and a bandana, possibly red, on his person. The petitioner had a "700" tattoo on his neck. Lamonte did not have any bandanas in his truck. Stewart testified that she had been dealing with the petitioner for two years and that he always had a red bandana in his back pocket. According to Lamonte, he gave the petitioner use of his truck in exchange for cocaine. Before the petitioner took the truck, Lamonte took Stewart home, then went back to the same location to pick up the petitioner. Stewart's home was about a three or four-minute drive from Tillman Park. According to Detective Bourgeois, the distance between Lamonte's house and Tillman Park Road was about three miles. Lamonte saw the petitioner with a handgun and told him he could not bring a gun in the truck. The petitioner handed the gun to someone nearby. Lamonte and the petitioner then drove to Lamonte's house (the same house as Stewart's), where Lamonte got out of the truck. The petitioner then took the truck and drove back toward Tillman Park. Shortly thereafter, the petitioner drove past Lamonte's house. Lamonte called the petitioner on his cell phone and asked him why he was running back and forth instead of buying cocaine. Over the next hour, Lamonte called the petitioner at least two more times. According to Lamonte, the petitioner returned the truck to him between 10:30 p.m. and midnight. The petitioner had an unknown black male with him in the truck. The petitioner told Lamonte that he could not get any cocaine. Lamonte dropped off the petitioner and the unknown person at Tillman Park.

The shooting occurred only minutes from where Lamonte lived. Detective Bourgeois testified that the distance between Lamonte's house and the place where Brumfield was shot (Drake Road) was 4.5 miles. Cedric McClain, who lived on Drake Road, testified at trial that he was outside when he saw a red truck pass with the driver wearing a red bandana like a ski mask. There were two black people in the truck, but McClain could not identify their gender. When the truck got to the end of the road, McClain heard gunshots. McClain testified that he remembered the truck had a white stripe at the bottom and one of the hubcaps was different. Jockel Hilliard, who lived on Ed Brown Road, which runs into Drake Road, testified at trial that he saw Brumfield at about 11:00 p.m. Hilliard walked past Brumfield, greeted him, then sat down in his (Hilliard's) yard. Brumfield was behind the house next door to Hilliard's house when Hilliard heard gunshots. Hilliard ran toward Brumfield and saw a little red truck at the stop sign. The truck turned left (eastbound) on Illinois Jones Road.

Deputy Alex Petho, with the Livingston Parish Sheriff's Office, testified that he arrived at the scene shortly after Brumfield had been shot. The deputy asked Brumfield what happened, and Brumfield said that two guys in a vehicle pulled up and shot him. People who had gathered around the scene told Deputy Petho that two guys in a red truck with a gray or white stripe shot Brumfield, then fled the area eastbound on Illinois Jones Road. Detective Bourgeois testified that Hilliard stated that he saw Brumfield standing close to the stop sign on Drake Road speaking to some people in a red truck with a white stripe. Hilliard was not looking at Brumfield exactly when the shots were fired, but when he looked back he saw Brumfield lying on the ground. Detective Bourgeois further testified that McClain told him (the detective) that he was outside when he saw a small red truck with a white or gray stripe pass in front of his residence. There were two black males in the truck pulling red bandanas over their faces. One of the males had

short hair, and the other male had curls or twists in his hair. Stewart testified that on the night the petitioner took Lamonte's truck, the petitioner was wearing a white muscle shirt, blue jean shorts, and a red handkerchief. She described his hair as "curls" down the side of his face and on the back, and "[t]hey were in just little ringlets-like." She also stated the petitioner had a "700" tattoo on his neck.

A red bandana was found in Lamonte's truck. When the petitioner was arrested the next day, he was standing in front of the same abandoned house on Tillman Park Road with a red bandana in his pocket. Stewart testified that when the petitioner was arrested, he was dressed the same way as the previous day. The pictures taken of the petitioner on the day of his arrest reveal that he has a "700" tattoo on his neck, he was wearing a white T-shirt, or muscle-type undershirt, and his hair was curly or in twists. Detective Bourgeois stated that the petitioner told him that he did not participate in any homicide, he did not know Lamonte or Stewart, and that he had never been in Lamonte's truck. However, the evidence clearly shows the petitioner, Lamonte, and Stewart all knew each other. Lamonte and Stewart identified the petitioner with particularity. Further, after Lamonte and Stewart gave statements to the police, Stewart took the police straight to the petitioner, who was standing in front of the same abandoned, gutted house that he was standing in front of the night before, when Lamonte and Stewart approached him again for some crack cocaine.

Further, based on the testimony of Lamonte, Stewart, and eyewitnesses, and the testimony regarding phone usage, the evidence clearly established that the petitioner was in Lamonte's truck the night Brumfield was shot and killed. According to the testimony of Lamonte, Stewart, and Detective Bourgeois, who corroborated their story by obtaining phone records, at the time Lamonte indicated the petitioner took his truck, there were three phone calls

between Lamonte and the petitioner. The first call was from the petitioner's cell to Lamonte's cell. The second call, which was for one minute, was from a landline in Lamonte's house to the petitioner's cell at 10:38 p.m. The third call, which was for one minute, was from a landline in Lamonte's house to the petitioner's cell at 10:50 p.m.

The petitioner's statement to Detective Bourgeois that he did not know Lamonte is clearly a lie, and at best is indicative of an attempt to divert attention away from him regarding the matter at issue, and reasonably interpreted as an indication of guilt.

The petitioner's cell phone was registered to Joshua Cook. Cook testified at trial that he and the petitioner were good friends and that he gave the petitioner a cell phone (the phone at issue in this case). According to Cook, he gave the petitioner the phone at the end of April or early May, 2009, and the phone was deactivated in August of 2009. Cook said he had the phone deactivated because it "came up missing" in June (of 2009). He said he knew the phone was missing in June because the petitioner told him it "went missing" in June. Cook testified that since the petitioner had been incarcerated, Cook had visited him twice. His last visit to the petitioner in jail had been three weeks to a month before trial. Cook also testified that he put money in the petitioner's commissary at jail.

Cook's testimony suggests the petitioner did not have the cell phone in July when Brumfield was shot, since, according to the petitioner as told by Cook, the petitioner lost the phone in June. However, Detective Bourgeois testified at trial that he questioned Cook about the petitioner's phone. Cook told the detective he gave the petitioner the phone about two months prior to the petitioner being arrested. Cook never told the detective that the petitioner told him that he had lost the phone.

According to Detective Bourgeois's call report, an early BOLO on the night of the shooting (2:09 a.m.) was for a red Dodge truck. But Detective Bourgeois explained at trial that Milliard had described what he saw as a small, red truck with gray stripes, which possibly could have been a Dodge. Thus, the investigation was in its preliminary stages and the detective suggested the make of the truck only as a possibility. After more was learned, the misinformation over the make of the truck was cleared up. The photographic evidence introduced at trial of Lamonte's Mazda truck clearly matched the testimony of the two eyewitnesses who identified the truck they saw at the time of the shooting as small, red, and with a white or grey stripe across it.

In light of the foregoing, the appellate court determined that the evidence was sufficient to establish that the petitioner was a principal in the second degree murder of Brumfield. *State v. Austin*, 11-2150 (La. App. 1 Cir. 6/8/12), 2012 WL 2061531. For the reasons noted by the state appellate court, the evidence presented in the instant case, viewed in the light most favorable to the prosecution, was sufficient for any rational trier of fact to find the petitioner guilty beyond a reasonable doubt. As such, the petitioner has not shown that the appellate court's decision was unreasonable. Accordingly, this Court should likewise reject the petitioner's claim challenging the sufficiency of the evidence.

## Certificate of Appealability

Should the petitioner pursue an appeal, a certificate of appealability should also be denied. An appeal may not be taken to the court of appeals from a final order in a habeas corpus proceeding "unless a circuit justice or judge issues a certificate of appealability." 28 U.S.C. § 2253(c)(1)(A). Although the petitioner has not yet filed a Notice of Appeal herein, the Court may address whether she would be entitled to a certificate of appealability. *See Alexander v.*

*Johnson*, 211 F.3d 895, 898 (5th Cir. 2000).  A certificate of appealability may issue only if a habeas petitioner has made a substantial showing of the denial of a constitutional right.  28 U.S.C. § 2253(c)(2).

In cases where the Court has rejected a petitioner's constitutional claims on substantive grounds, a petitioner must demonstrate that "jurists of reason could disagree with the district court's resolution of his constitutional claims or that jurists could conclude the issues presented are adequate to deserve encouragement to proceed further." *Pippin v. Dretke*, 434 F.3d 782, 787 (5th Cir. 2005), *quoting Miller-El v. Cockrell*, 537 U.S. 322, 327 (2003).  In the instant case, the Court finds that reasonable jurists would not debate the denial of petitioner's application or the correctness of the substantive ruling.  Accordingly, it is appropriate that, in the event that the petitioner seeks to pursue an appeal in this case, a certificate of appealability should be denied.

## **RECOMMENDATION**

It is recommended that the petitioner's application for habeas corpus relief be denied, and that this proceeding be dismissed.  It is further recommended that in the event the petitioner pursues an appeal in this case, a certificate of appealability be denied.

Signed in Baton Rouge, Louisiana, on June 28, 2017.

**RICHARD L. BOURGEOIS, JR.**
**UNITED STATES MAGISTRATE JUDGE**